## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ARELIS MARGARITO,<br>　　　*Plaintiff*,<br><br>　　　　v.<br><br>BRIDGEPORT HOSPITAL,<br>　　　*Defendant*. | No. 3:18-cv-281 (VAB) |

### RULING AND ORDER MOTION FOR SUMMARY JUDGMENT

Arelis Margarito ("Plaintiff"), *pro se*, has sued Bridgeport Hospital ("Defendant" or "the Hospital"), alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), on the basis of race, sex, and age. Compl., ECF No. 1 (Feb. 15, 2018).

Bridgeport Hospital has moved for summary judgment. Mot. for Summ. J., ECF No. 34 (Feb. 10, 2020). Ms. Margarito has not responded.

For the following reasons, Defendant's motion for summary judgment is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

<u>Events during Ms. Margarito's Employment with Bridgeport Hospital</u>

On January 11, 2010, Ms. Margarito began working at Bridgeport Hospital. Def.'s Local

Civil Rule 56(a)1 Statement of Undisputed Material Facts ¶ 1, ECF No. 34-5 (Feb. 10, 2020)

("Def.'s SOMF"); Margarito Dep. 90:15–16, ECF No. 43-2 at 48.[2]

From October 20, 2014 until her termination, Ms. Margarito was a Business Associate in

the Hospital's Intermediate Care Area ("ICA") reporting to Jennifer O'Neil, Nurse Manager.

Def.'s SOMF ¶ 2; Margarito Dep. 90:1–21; O'Neil Aff. ¶¶ 2–3, ECF No. 34-4 at 1.[3]

In 2015, Ms. Margarito began experiencing difficulties working with Keri Yacovacci, a

nurse in the ICA. Def.'s SOMF ¶ 2; O'Neil Aff. ¶ 4; Margarito Dep. Ex. 18, ECF No. 34-3 at 65

("Margarito Summary of Events"); *see also* Margarito Dep. 100:20–101:6 (identifying Exhibit

18 as her "own summary of events" which she created "[a]s they were happening").

In May of 2015, according to Ms. Margarito, Ms. Yacovacci accused her of stealing

money out of her purse in her locker "because [their] lockers were next to each other," despite

---

[1] The factual background is drawn from Defendant's Local Rule 56(a)1 Statement of Material Facts, to the extent the facts set forth therein are supported by evidence in the record. *See* D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party."); *Barone v. Judicial Branch of Conn.*, No. 3:17-cv-644 (VAB), 2019 WL 7283383, at *11 (D. Conn. Dec. 27, 2019) ("When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted." (quoting *SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004) (internal quotation marks omitted))).

[2] Defendant submitted Ms. Margarito's deposition transcript within the same document as its counsel's affidavit and many of the exhibits to Ms. Margarito's deposition. ECF No. 34-2 (Feb. 10, 2020). The deposition is located at ECF No. 34-2 at 5–90. The Court hereafter cites to deposition pages and paragraphs, not ECF document page numbers.

[3] Defendant submitted Ms. O'Neil's affidavit along with all attached exhibits within the same document. ECF No. 34-4 (Feb. 10, 2020). The affidavit is located at ECF No. 34-4 at 1–3. The Court hereafter cites to affidavit paragraphs, not ECF document page numbers.

the fact that "someone else . . . confessed that she stole the money." Def.'s SOMF ¶ 19; Margarito Dep. 61:9–20; Margarito Summary of Events, ECF No. 34-3 at 65.

In May of 2015, Ms. Margarito called the Stratford Police Department to report that she believed her coworkers possessed a videotape of her. Def.'s SOMF ¶ 14; Margarito Dep. 126:1–6. The Stratford Police Department did not investigate or follow up with Ms. Margarito at all regarding her complaint. Def.'s SOMF ¶ 14; Margarito Dep. 126:7–25.

Ms. Margarito believed that, at some point, a colleague had taken a video of her in the restroom and then disseminated it to others, suggesting that it was a video of Ms. Margarito masturbating. Def.'s SOMF ¶¶ 26–27; Margarito Dep. 103:16–110:11; Margarito Summary of Events, ECF No. 34-3 at 64. It is unclear whether this is the same video to which Ms. Margarito referred in her complaint to the Stratford Police Department.

In July of 2015, Ms. O'Neil met with Ms. Margarito and Ms. Yacovacci to try to resolve their issues. O'Neil Aff. Ex. A, ECF No. 34-4 at 6 (E-mail from Jennifer O'Neil to Trina Regina, "f/u on Arelis Margarito" (July 31, 2015)) ("O'Neil July 2015 Meeting Summary").

On October 29, 2015, Ms. Margarito called the Hospital's corporate compliance hotline to complain that Ms. Yacovacci and another nurse, Emma Branca, were harassing her "by providing false accusations about her, spreading rumors stating that she steals and she is discriminatory against African Americans." Def.'s SOMF ¶ 4; Margarito Dep. 71:23–72:18; Margarito Dep. Ex. 10, ECF No. 34-2 at 110–111 (Global Compliance Alertline System Report (Oct. 29, 2015)) ("Oct. 29, 2015 Complaint"). She also complained that Dr. Stephen Marshalko had taken a picture of her at her desk the day before and accused her of not completing her job tasks. Def.'s SOMF ¶ 5; Margarito Dep. 72:19–73:8; Oct. 29, 2015 Complaint.

Kelly Malasics, Employee Relations Specialist, and Ms. O'Neil investigated the October 29, 2015 complaint, and they found that Ms. Margarito's allegations were unfounded. Def.'s SOMF ¶ 7; O'Neil Aff. ¶ 5.

On November 22, 2015, according to Ms. Margarito, a student nurse told Jane Albrecht, a nurse coworker, that Ms. Margarito had groped her. Def.'s SOMF ¶ 31; Margarito Dep. 111:4–112:8; Margarito Summary of Events, ECF No. 34-3 at 66.

In December of 2015, according to Ms. Margarito, Ms. Yacovacci and Laura Fracker, a Patient Care Technician, told other coworkers that Ms. Margarito "engaged in sexual acts with men in work garages." Def.'s SOMF ¶ 30; Margarito Dep. 112:19–114:14; Margarito Summary of Events, ECF No. 34-3 at 67.

In January of 2016, according to Ms. Margarito, she changed a patient's sheet after spilling juice on the patient, and Ms. Albrecht entered the room; and Ms. Margarito believed that Ms. Albrecht asked the patient if Ms. Margarito was being inappropriate. Def.'s SOMF ¶ 32; Margarito Dep. 114:15–115:17; Margarito Summary of Events, ECF No. 34-3 at 67.

On March 13, 2016, Ms. Margarito called the corporate compliance hotline again and complained that Ms. Yacovacci and Ms. Fracker had retaliated against her by prompting Daniel Myers, a Unit Support Worker, to falsely accuse Ms. Margarito of touching him inappropriately. Def.'s SOMF ¶ 8; Margarito Dep. Ex. 11, ECF No. 34-2 at 113–114 (Global Compliance Alertline System Report (Mar. 13, 2016)) ("Mar. 13, 2016 Complaint").

On March 15, 2016, Ms. Margarito dual-filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated and retaliated against, and harassed, due to her sexual orientation, ancestry, and previous opposition to discriminatory

4

conduct. Def.'s SOMF ¶¶ 35–36; Margarito Dep. Ex. 9, ECF No. 34-2 at 104–07 (CHRO Aff. of Illegal Discriminatory Practice (Mar. 15, 2016)) ("CHRO Compl.").

Ms. Malasics investigated the allegations in the March 13, 2016 complaint and again determined that they were unfounded. Def.'s SOMF ¶ 9; O'Neil Aff. ¶ 6; O'Neil Aff. Ex. C, ECF No. 34-4 at 12–13 (E-mail from Kelly Malasics to Myron Mccoo, "Corporate Compliance Complaint Follow Up" (Mar. 30, 2016)) ("Malasics March 2016 Complaint Investigation Summary").

On August 22, 2016, Ms. Margarito called the corporate compliance hotline for a third time, complaining that Ms. Albrecht and two additional co-workers—Kelly Serrano, a technician, and Shawna Hall, a nurse—had been harassing her for the past two years. Def.'s SOMF ¶ 11; Margarito Dep. 86:23–87:10; Margarito Dep. Ex. 15, ECF No. 34-3 at 57–58 (Global Compliance Alertline System Report (Aug. 22, 2016)) ("Aug. 22, 2016 Complaint"). She reported specifically that Ms. Serrano had told others that Ms. Margarito had yelled at her and acted violently towards her; that Ms. Albrecht had once nudged Ms. Margarito and implied that her job performance was unsatisfactory; that Ms. Hall had accused Ms. Margarito of "looking at female employees' backsides;" and that all three "would call security when [Ms. Margarito] spoke up or seemed frustrated." Def.'s SOMF ¶ 12; Margarito Dep 87:11–88:13; August 22, 2016 Complaint.

Once again, Ms. Malasics investigated Ms. Margarito's allegations, conducted multiple interviews with other employees, and again concluded that the allegations were unfounded. Def.'s SOMF ¶ 13; O'Neil Aff. ¶ 7. All three of the employees mentioned by Ms. Margarito denied that the alleged events ever occurred. Def.'s SOMF ¶ 13; O'Neil Aff. Ex. D, ECF No. 34-

4 at 15–20 (Malasics Summaries of Employees' Responses to Margarito Allegations (Aug. 30, 2016–Sept. 19, 2016)) ("Employee Responses to Pl.'s Aug. 2016 Allegations").

On August 25, 2016, Ms. Margarito filed a report with the Bridgeport Police Department alleging that a coworker was spreading rumors about her and that a person at work was "violent" with her by "nudging [her] and doing things in a violent way." Def.'s SOMF ¶ 15; Margarito Dep. 129:2–130:3; Margarito Dep. Ex. 21, ECF No. 34-3 at 85 (Complaint Service Form, Dep't of Police, Bridgeport, Connecticut (Aug. 25, 2016)) ("Aug. 2016 Police Complaint").

At various other unspecified times during her employment with Bridgeport Hospital, Ms. Margarito believed that additional rumors were circulating about her.

Ms. Margarito believed Ms. Yacovacci was spreading other rumors about her and harassing her in various ways. She believed Ms. Yacovacci was spreading rumors both that Ms. Margarito was a lesbian and that she liked "old men." Def.'s SOMF ¶¶ 23–24; Margarito Dep. 93:19–94:8, 101:16–102:3. She stated she believed that Ms. Yacovacci encouraged her unit to turn against her, including having the CEO of the hospital and security staff "walk through the unit to watch [her]." Def.'s SOMF ¶ 22; Margarito Dep. 130:22–131:24.

According to Ms. Margarito, at some point, her aunt told her that "an unidentified individual claiming to be from [her] place of employment called her aunt and asked if [Ms. Margarito had ever sexually molested anyone in her family." Def.'s SOMF ¶ 21; Margarito Dep. 64:25–65:22. Ms. Margarito says that the individual further told her aunt that Ms. Margarito was violent, that she steals, and that she engages in sexually inappropriate behavior. Def.'s SOMF ¶ 21; Margarito Dep. 65:24–66:2.

Ms. Margarito believes that Ms. Branca, at some point, looked at her medical records and disseminated private health information relating about her and her family members, including

that family members had histories of mental health issues and drug use. Def.'s SOMF ¶ 28;

Margarito Dep. 99:16–100:14, 131:25–135:20.

Ms. Margarito also believes that her accounts were hacked, "because she received emails

from Apple saying her account was being hacked," and she suspected that the individual

spreading rumors was involved in the hacking. Def's SOMF ¶ 25; Margarito Dep. ¶ 102:10–

103:13. Ms. Margarito wanted the police to investigate the hacking, but the police declined.

Def.'s SOMF ¶ 25; Margarito Dep. 102:16–18.

At some point, Ms. Margarito saw a visitor speaking to a nurse, either Ms. Albrecht or

Ms. Yacovacci, and approached the visitor afterwards to ask whether the nurse had said anything

negative about Ms. Margarito. Def.'s SOMF ¶ 33; Margarito Dep. 66:18–67:5. The visitor

responded that the nurse had not said anything. *Id.*

According to Ms. Margarito, at some point, a doctor who had been taking pictures of Ms.

Margarito[4] "happened to come one day and s[i]t next to [Ms. Margarito] at [her] desk." Def.'s

SOMF ¶ 20; Margarito Dep. 63: 17–22. While sitting next to Ms. Margarito, the doctor had a

heart attack and died. Def.'s SOMF ¶ 20; Margarito Dep. 63:21–64:5. Ms. Margarito believes

that after the doctor died while sitting next to her, Ms. Albrecht told another coworker that Ms.

Margarito practices witchcraft "and that's why the doctor passed away." Def.'s SOMF ¶ 20;

Margarito Dep. 64:6–19.

On October 25, 2016, Ms. Margarito filed another police report with the Bridgeport

Police Department, complaining that she was suffering "long-term harassment" by her

coworkers, and that she believed Ms. Yacovacci was spreading rumors about her at work, on

---

[4] It is unclear whether the doctor who had been taking pictures of Ms. Margarito at her desk and then allegedly died while sitting next to Ms. Margarito was Dr. Marshalko or another doctor.

Facebook, at her gym, and at her school. Def.'s SOMF ¶¶ 16–17; Margarito Dep. Ex. 21, ECF

No. 34-3 at 80 (Complaint Service Form, Dep't of Police, Bridgeport, Connecticut (Oct. 25,

2016)) ("Oct. 2016 Police Complaint"); Margarito Dep. Ex. 21, ECF No. 34-3 at 81–82 (Incident

Report, Dep't of Police, Bridgeport, Connecticut (Oct. 25, 2016)) ("Oct. 2016 Incident Report").

Ms. Margarito also stated that one of her car tires had been slashed on September 17, 2016

(though she did not file a report related to that incident), and she believed Ms. Yacovacci had

slashed it. Def.'s SOMF ¶ 17; Margarito Dep. 128:13–21; Oct. 2016 Incident Report. A

Bridgeport Police officer sent to Ms. Margarito's home spoke with her, but she found that Ms.

Margarito "could provide no evidence of [her claims], only that she suspects these things are

taking place." Def.'s SOMF ¶ 18; Margarito Dep. 128:22–129:1; Oct. 2016 Incident Report.

<u>Disciplinary Proceedings and Concerns Preceding Ms. Margarito's Termination</u>

On September 23, 2016, Ms. O'Neil gave Ms. Margarito a "first and final" written

warning for failing to meet the minimum performance standards in her role as Business

Associate. Def.'s SOMF ¶ 38; Margarito Dep. 90:4–92:24; O'Neil Aff. ¶ 8; O'Neil Aff. Ex. E,

ECF No. 34-4 at 22 (Employee Disciplinary Notice Summary); Margarito Dep. Ex. 16, ECF No.

34-3 at 60–61 (Employee Disciplinary Notice Summary with Pl.'s Notes); Margarito Dep. Ex.

20, ECF No. 34-3 at 74–75 (Aquila Resp. to Margarito Rebuttal). The warning identified several

examples of Mr. Margarito's failure to meet "Service Excellence" requirements for her position,

including failure to communicate information to clinicians regarding patient status and to alert

clinical staff of the availability of key materials. Def.'s SOMF ¶ 38; Employee Disciplinary

Notice Summary.

The warning stated further that "any future policy violations, performance issues, or

conduct infractions" would result in her immediate discharge from the Hospital. Def.'s SOMF ¶

38; Employee Disciplinary Notice Summary. The warning also stated that Ms. Margarito "ha[d] the right to prepare a written rebuttal to this [] final written warning . . . ." Def.'s SOMF ¶ 39; Employee Disciplinary Notice Summary.

On October 6, 2016, Ms. Margarito submitted a written rebuttal to the final written warning. Def.'s SOMF ¶ 39; Margarito Dep. 119:25–120:9; Margarito Dep. Ex. 20, ECF No. 34-3 at 71–73 (Margarito Rebuttal to Disciplinary Notice).

On October 14, 2016, Ms. Margarito met with Anne Aquila, Director of Wounds, Critical Care, and Nursing Shared Governance, and Ms. Malasics to discuss her rebuttal and "grieve the disciplinary action." Aquila Resp. to Margarito Rebuttal.

On October 21, 2016, Ms. Aquila wrote a letter to Ms. Margarito in response to her rebuttal. Def.'s SOMF ¶ 39; Aquila Resp. to Margarito Rebuttal. Ms. Aquila listed three specific infractions in August and September of 2016 relating to Ms. Margarito's failure to respond to patient requests for assistance or convey information regarding patient care to other staff, resulting in delay of patient care. Aquila Resp. to Margarito Rebuttal. Ms. Aquila stated that, "[a]fter careful consideration of the information [Ms. Margarito] provided during the meeting, both in conversation and in writing," she had "determined that the final written warning will remain in effect." Def.'s SOMF ¶ 39; Aquila Resp. to Margarito Rebuttal.

She stated further that there was a "concerning pattern of [Ms. Margarito's] behavior, which d[id] not support the culture of teamwork and safety in the unit," and that the specific instances described "demonstrate[d her] failure to use" "teamwork, problem solv[ing,] and communication" skills, "which are critical to the safe operation of the ICA." Def.'s SOMF ¶ 39; Aquila Resp. to Margarito Rebuttal. Ms. Aquila noted, however, that Ms. Margarito could appeal

the decision to MaryEllen Kosturko, Senior Vice President of Patient Care Operations and Chief

Nursing Officer. Def.'s SOMF ¶ 40; Aquila Resp. to Margarito Rebuttal.

On October 27, 2016, Ms. Margarito appealed Ms. Aquila's decision to leave her final

disciplinary letter in place to Senior Vice President Kosturko. Def.'s SOMF ¶ 40; Margarito Dep.

Ex. 20, ECF No. 34-3 at 76–77 (Margarito Appeal of Disciplinary Notice).

On November 10, 2016, Ms. Margarito met with Senior Vice President Kosturko and Ms.

Malasics to address the three specific instances cited in Ms. Aquila's letter. Margarito Dep. Ex.

20, ECF No. 34-3 at 78 (Kosturko Decision on Margarito Appeal).

On November 16, 2016, Senior Vice President Kosturko sent a letter to Ms. Margarito

informing her that, "[a]fter careful consideration of the information [she] provided during the

meeting, both in conversation and in writing," Ms. Kosturko had "determined that the final

written warning will remain in effect." Def.'s SOMF ¶ 40; Kosturko Decision on Margarito

Appeal. She noted, however, that Ms. Margarito could again appeal the decision in writing to the

President and CEO of Bridgeport Hospital "for final consideration," so long as the appeal was

made no later than Friday, November 25, 2016. Kosturko Decision on Margarito Appeal.

Ms. O'Neil and other coworkers became increasingly concerned about Ms. Margarito in

late 2016. Def.'s SOMF ¶ 41; O'Neil Aff. ¶ 9. Ms. O'Neil "conferred with Myron McCoo, the

Human Resources Director, regarding [Ms. Margarito's] increasing complaints against her

[co]workers, including allegations of a conspiracy against her, and the belief that her coworkers

had made accusations against her that had never happened." *Id.* Ms. O'Neil and Mr. McCoo

"shared serious concerns for Ms. Margarito's wellbeing, as well as that of her coworkers, some

of whom had begun to express a fear for their safety and a belief that Ms. Margarito was creating

a hostile work environment." Def.'s SOMF ¶ 42; O'Neil Aff. ¶ 9. They decided that the behavior

10

warranted consultation with the Hospital's Employee and Family resource Program. Def.'s SOMF ¶ 43; O'Neil Aff. ¶ 9.

On December 7, 2016, Ms. McNeil and Mr. McCoo met with Ms. Margarito, along with the Assistant Nurse Manager and the coordinator of the Employer and Family Resource Program. Def.'s SOMF ¶ 44; O'Neil Aff. ¶ 9. "Given the seriousness and severity of the concerns raised, [Ms. Margarito] obtaining this consultation was made a condition of [her] continued employment." *Id.*

On December 30, 2016, and again on January 3, 2017, Ms. O'Neil and Ms. Malasics followed up with Ms. Margarito by phone regarding the requirement that she consult with the Employee and Family Resource Program. Def.'s SOMF ¶ 45; O'Neil Aff. ¶ 10.

On January 3, 2017, Ms. O'Neil also sent a letter to Ms. Margarito stating that she had left voicemails with Ms. Margarito on December 30 and January 3 "to follow up . . . as to whether or not [Ms. Margarito] ha[d] contacted the Employee Family Resources program," which "was a requirement of continued employment that was communicated to [her] on December 7, 2016." Margarito Dep. Ex. 20, ECF No. 34-3 at 79 (Letter from Jennifer O'Neil to Arelis Margarito (Jan. 3, 2017)) ("Jan. 3, 2017 O'Neil Letter"). Ms. O'Neil stated that she would make a final attempt to reach Ms. Margarito on January 4, 2017. *Id.*

On January 4, 2017, Bridgeport Hospital terminated Ms. Margarito's employment due to her failure to comply with the requirement that she contact the Employee and Family Resource Program. Def.'s SOMF ¶ 46; O'Neil Aff. ¶ 11; Margarito Dep. 52:9–11, 124:11–125:16; O'Neil Ex. G, ECF No. 34-4 at 31 (Letter from Jennifer O'Neil to Arelis Margarito (Jan. 4, 2017)) ("Jan. 4, 2017 Termination Letter").

Ms. Margarito states that she suffers from social isolation since being terminated, because, in her view, people outside the hospital "look at [her] in a different way" due to rumors that she believes were spread at the Hospital. Def.'s SOMF ¶ 34; Margarito Dep. 137:7–138:17. Ms. Margarito also believes that she has been blacklisted with other employers, because she "was under the impression that [Bridgeport Hospital personnel] were giving [her] bad references." Def.'s SOMF ¶¶ 47–48; Margarito Dep. 22:11–23:25; Margarito Dep. Ex. 6, ECF No. 34-2 at 92 (Pl.'s List titled "Jobs Applied→Bad Reference Blacklisted").

Ms. Margarito went on to hold several temporary positions, including with Yale-New Haven Smilow Cancer; Cane Mount Medical; and LabCorps. Def.'s SOMF ¶ 49; Margarito Dep 30:12–42:23; Margarito Dep. Ex. 7, ECF No. 34-2 at 93 (Pl.'s List of Employers). She states that she filed complaints against several coworkers at these employers. Pl.'s List of Employers.

Ms. Margarito did not amend her March 15, 2016 CHRO Complaint, nor has she filed a new complaint with the CHRO/EEOC addressing the alleged events following her March 15, 2016 CHRO Complaint, including her 2017 termination from Bridgeport Hospital Def.'s SOMF ¶ 37; Margarito Dep. 52:23–54:1.

**B. Procedural Background**

On December 18, 2017, the CHRO sent Ms. Margarito a notice by e-mail that her March 15, 2016 CHRO Complaint had been dismissed upon a finding that the "complaint as alleged fails to state a valid claim and must be dismissed." Margarito Dep. Ex. 9, ECF No. 34-2 at 102–03, 108 (E-mail and Notice of Administrative Dismissal (Dec. 18, 2017)) ("CHRO Dismissal").

On January 23, 2018, the EEOC issued a dismissal and notice of rights to Ms. Margarito informing her that it had adopted the findings of the CHRO and was closing her case, and that Ms. Margarito could file a lawsuit in federal or state Court based on the charges in the CHRO

Complaint "within 90 days of [he]r receipt of this notice." Margarito Dep. Ex. 8, ECF No. 34-2 at 98–99 (EEOC Dismissal and Notice of Rights (Jan. 23, 2018)) ("EEOC Right to Sue Letter").

On February 15, 2018, Ms. Margarito filed her Complaint. Compl. After an unsuccessful first attempt to serve Defendant, the Court directed the U.S. Marshal to serve Defendant on January 17, 2019. *See* Order, ECF No. 17 (Jan. 17, 2019).

On February 6, 2019, Bridgeport Hospital moved for a more definite statement requesting that Ms. Margarito "(1) identify what, if any, common law claims she intends to invoke by virtue of her factual allegations, (2) separate the claims into distinct counts and identify the factual and legal basis for each claim; and (3) provide a demand for judgment specifying the relief sought." Def.'s Mot. for More Definite Statement, ECF No. 21 (Feb. 6, 2019).

On March 27, 2019, following a telephonic conference, the Court denied Defendant's motion for a more definite statement without prejudice to renewal "[b]ecause this case has not proceeded to discovery." Order, ECF No. 27 (Mar. 27, 2019) (citing *Vaden v. Lantz*, 459 F. Supp. 2d 149, 151 (D. Conn. 2006) ("Such motions are generally disfavored . . . and are not intended to substitute for the normal discovery process." (internal citation and quotation marks omitted)); *Monaco v. Carpinello*, No. CV-98-3386 (CPS), 2004 WL 3090598, at *9 (E.D.N.Y. July 22, 2004) ("The preferred course is to encourage the use of discovery to inform the defendant of the factual basis of the complaint.")).

On April 12, 2019, Bridgeport Hospital filed its Answer to the Complaint. Answer, ECF No. 30 (Apr. 12, 2019). Discovery proceeded following the Court's scheduling order. Sched. Order, ECF No. 28 (Mar. 27, 2019).

On December 12, 2019, the Court held a post-discovery telephonic status conference. Minute Entry, ECF No. 31 (Dec. 12, 2019). Ms. Margarito did not attend; "Defendant's Counsel reported that they tried to reach Plaintiff but were unsuccessful." *Id.*

On February 10, 2020, Bridgeport Hospital moved for summary judgment. Mot. for Summ. J. In support of its motion, Bridgeport Hospital filed a memorandum of law and a Local Rule 56(a)1 Statement of Undisputed Material Facts. Mem. of Law in Supp. of Def.'s Mot. for Summ. J., ECF No. 34-1 (Feb. 10, 2020) ("Def.'s Mem."); Def.'s SOMF. Bridgeport Hospital also filed an affidavit from Jennifer O'Neil, Nurse Manager at Bridgeport Hospital, along with six exhibits to Ms. O'Neil's affidavit, O'Neil Aff. & Exs., ECF No. 34-4 (Feb. 10, 2020); and an affidavit from Defendant's counsel, along with excerpts of Ms. Margarito's deposition and exhibits to that deposition, Park Aff., Margarito Dep. & Exs. Pt. 1, ECF No. 34-2 (Feb. 10, 2020); Margarito Dep. Exs. Pt. 2, ECF No. 34-3 (Feb. 10, 2020).

Ms. Margarito has not responded to Defendant's motion for summary judgment.

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

14

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

15

sought.'"). Additionally, complaints filed by *pro se* plaintiffs "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

"The non-moving party need not respond to the motion" for summary judgment; "[h]owever, a non-response runs the risk of unresponded-to statements of undisputed facts [proffered] by the movant being deemed admitted." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (citing Fed. R. Civ. P. 56(e)(2); *Jones v. Lamont,* No. 05 Civ. 8126, 2008 WL 2152130, at *1 (S.D.N.Y.2008) ("In view of [pro se ] plaintiff's failure to respond to the motion, the well supported factual allegations set forth in defendants' Rule 56.1 statement are deemed admitted."), *aff'd*, 379 F. App'x 58 (2d Cir. 2010).

The Second Circuit has held, however, that Federal Rule of Civil Procedure 56 "does not embrace default judgment principles. Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004). "[F]ailure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has

fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Id.* at 244.

"[I]f a non-moving party fails to oppose a summary judgment motion, then 'summary judgment, if appropriate, shall be entered against' him. *Vt. Teddy Bear Co.*, 373 F.3d at 244 (quoting Fed. R. Civ. P. 56(e)). But "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir.2001). "[T]he court may [also] rely on other evidence in the record even if uncited." *Jackson*, 766 F.3d at 194 (citing Fed. R. Civ. P. 56(c)(3)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*'" *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citation in the original) (quoting *Amaker*, 274 F.3d at 681); *see also Giannullo v. City of N.Y.*, 322 F.3d 139, 141 (2d Cir. 2003) (noting that the "non-movant is not required to rebut an insufficient showing").

> Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.

*Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo,* 322 F.3d at 143 n.5 (stating that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts")).

Additionally, "[a]n unopposed summary judgment motion may fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Vt. Teddy*

*Bear Co.*, 373 F.3d at 244 (quoting *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996) (internal

quotation marks and citations omitted)).

## III.    DISCUSSION

Under Title VII, it is "unlawful for an employer 'to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72,

85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).

Ms. Margarito claims that Bridgeport Hospital discriminated against her on the basis of

her race, sex, and age, in violation of Title VII. Compl. at 3.

Bridgeport Hospital moves for summary judgment, arguing that Ms. Margarito has failed

to exhaust her administrative remedies as to some of her claims, and that in any event, she has

failed to create a genuine issue of material fact that she was discriminated against in violation of

Title VII. Def.'s Mem. at 16–32.

### A.   Exhaustion of Administrative Remedies

A plaintiff alleging employment discrimination under Title VII may not seek relief in a

federal court until the plaintiff timely exhausts administrative remedies before the EEOC. *See*

*Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir.2001) (discussing exhaustion under Title VII);

*Hansen v. Jones Lang LaSalle Americas, Inc.*, 103 F. Supp. 3d 221, 222 (D. Conn. 2015).

"Before bringing a Title VII suit in federal court, an individual must first present the claims

forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency."

*Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) (citation omitted and internal

quotation marks omitted); *see also Hubert v. Conn. Dep't of Corr.*, No. 3:14-cv-476 (VAB),

2018 WL 1582508, at *23 (D. Conn. Mar. 30, 2018) (dismissing claims against several defendants because plaintiff had not filed CHRO or EEOC complaints regarding the allegations involving them). If the individual has not alleged a claim in the EEOC complaint, "federal courts generally have no jurisdiction to hear [it]." *Shah v. N.Y. State Dep't of Civ. Serv.*, 168 F.3d 610, 613 (2d Cir. 1999).

But "because failure of a Title VII plaintiff to exhaust administrative remedies is a claim-processing rule—as opposed to a jurisdictional rule—exhaustion of administrative remedies as a prerequisite to suit is subject to equitable defenses." *Hubert*, 2018 WL 1582508, at *17 (citing *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385–86 (2d Cir. 2015)); *see also Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) ("[P]resentation of a Title VII claim to the EEOC is not a jurisdictional prerequisite, but only a precondition to bringing a Title VII action that can be waived by the parties or the court." (internal citation, quotation marks, and alterations omitted)).

As a result, a court may hear only those Title VII claims "that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (citation omitted), *superseded by statute on other grounds*; *O'Hara v. Mem'l Sloan-Kettering Cancer Ctr.*, 27 F. App'x 69, 70 (2d Cir. 2001) (summary order) ("There must be some factual or legal nexus between the substance of the allegations contained in the administrative charge and the new cause of action." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001))).

The Second Circuit has recognized several types of situations "where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair

19

to civil rights plaintiffs to bar such claims in a civil action," and has "loosely referred to these claims as 'reasonably related' to the allegations in the EEOC charge." *Butts*, 990 F.2d at 1402. The defense arises from a recognition that "EEOC charges [are] frequently are filled out by employees without the benefit of counsel," *id.*, as is the case for Ms. Margarito.

Subsequent conduct is reasonably related to conduct in an EEOC charge if: "[1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402–03 (describing three types of "reasonably related claims")). Courts in the Second Circuit have made clear that the equitable exception to administrative exhaustion under Title VII does not permit a Title VII plaintiff to freely import non-exhausted claims into the case. *See, e.g.*, *Crawford v. Nat'l R.R. Passenger Corp.*, No. 3:15-cv-131 (JBA), 2015 WL 8023680, at *4 (D. Conn. Dec. 4, 2015) (casting doubt as to whether racist and threatening behavior by the plaintiff's co-worker was reasonably related to alleged retaliation amounting to an un-named supervisor's decision to hire the white relatives of one of the plaintiff's harassers over the plaintiff's daughter-in-law).

Bridgeport Hospital argues that Ms. Margarito has failed to exhaust her administrative remedies as to her claims based on her termination and her claims of discrimination based on religion, because she did not raise them in her CHRO Complaint and they were not reasonably related to the claims in her CHRO Complaint. Def.'s Mem. at 18–20.

The Court agrees.

20

"In determining whether claims are reasonably related, the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (internal citation and quotation marks omitted). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin*, 335 F.3d at 202).

In her CHRO Complaint, Ms. Margarito alleged that, between July 2015 and March 25, 2016, she had experienced conduct that constituted discrimination on the basis of her race, ancestry, and perceived sexual orientation, in violation of Title VII and state discrimination laws; and that that she faced retaliation for previously opposing discrimination. CHRO Compl., ECF No. 34-2 at 104–07. She alleged that several coworkers "ha[d] spread rumors that [she had] stolen money and medications, that [she was] incompetent at [her] job[,] and that [she was] gay. *Id.* at 105. Ms. Margarito specifically alleged that Ms. Yacovacci and Ms. Branca were spreading rumors. *Id.* at 105–06. She also specifically alleged that Dr. Marshalko twice took photographs of her at her desk and that he did so to show that she was not working. *Id.* at 106.

She further alleged that a nursing intern complained to Ms. Albrecht that Ms. Margarito had "touched her in an inappropriate manner," and Ms. Margarito believed that this occurred because Ms. Albrecht had told the nursing intern that Ms. Margarito was gay, which she is not. *Id.* She stated that she believed she was treated this way because of her "color (Brown), ancestry (Puerto Rican)[,] and perceived sexual orientation (Lesbian)," noting that she was "the only individual of Puerto Rican ancestry and Hispanic heritage working in the ICA" and that she believed another business associate who was "Caucasian" was "not treated in this way." *Id.* at 106–07.

21

The contours of the Title VII claims in Ms. Margarito's Complaint are not entirely clear. Her clearest allegation appears to be that her termination on January 4, 2017, was a discriminatory adverse employment action in violation of Title VII. Compl. at 3. She alleges further that Bridgeport Hospital violated Title VII because her coworkers "accus[ed her] of stealing [and] inappropriate behavior;" because she was fired, after mediation, and was told "[that she] had to attend mandatory EAP (Employee Assistance Program) [consultation] and did not explain why;" and because coworkers spread false rumors that she was a lesbian and spread rumors that she practices witchcraft, though she is Christian. Compl. at 2–3. These allegations appear to encompass conduct that was the subject of the March 25, 2016 CHRO Complaint, as well as conduct that occurred after March 25, 2016.

To the extent Ms. Margarito's Complaint is based on alleged events that she raised in her CHRO Complaint, she has exhausted her administrative remedies and filed her Complaint within 90 days of receiving her EEOC Right to Sue letter, permitting her to bring claims based on charges within the CHRO Complaint in federal court. *See* EEOC Right to Sue Letter.

In order for Ms. Margarito to have exhausted her administrative remedies as to claims not raised in her CHRO Complaint, however, she must show that they are reasonably related to the claims she did raise in her CHRO Complaint.

As an initial matter, Ms. Margarito does not explicitly allege retaliation under Title VII; nor can her Complaint be fairly read to allege retaliation, as she does not reference the existence of her CHRO Complaint—or any other complaint of discrimination—or that any staff at Bridgeport Hospital was aware of her filing any Complaint. Rather, her Complaint revolves entirely around rumors that she believes coworkers were spreading about her, in addition to her January 4, 2017 discharge. Thus, none of the allegations based on events after March 25, 2016,

in Ms. Margarito's Complaint are reasonably related to her CHRO Complaint under the second *Butts* category, permitting claims that "allege[] retaliation for filing the EEOC charge." *Alfano*, 294 F.3d at 381; *see also id.* at 382 ("[Plaintiff] did not allege that DOCS retaliated against her for filing an EEOC charge; her vague, conclusory accusations of 'retaliatory conduct' are insufficient to meet the *Butts* requirement of a specific linkage between filing an EEOC charge and an act of retaliation.").

Ms. Margarito's claims based on her January 4, 2017 discharge, and her claims of discrimination on the basis of religion, also fail to satisfy the "reasonably related" tests articulated in the first and third *Butts* categories.

Ms. Margarito did not—and, of course, could not have—raised a claim in her March 2016 CHRO Complaint based on her January 2017 termination. Nor was there any indication in her CHRO Complaint that she believed her employment to be in jeopardy in March 2016. The EEOC did not rule on Ms. Margarito's complaint before that agency until December 18, 2017, eleven months after her discharge. CHRO Dismissal. Yet, Ms. Margarito did not alert the EEOC of her termination or amend her CHRO Complaint at any point to add an allegation that her termination was discriminatory, despite being told during her CHRO mediation that she could update her CHRO charge. *See* Margarito Dep. 53:7–54:1.

Moreover, to the extent that Ms. Margarito connects the requirement that she consult with the Employee Assistance Program to her allegation that her termination was discriminatory, the CHRO and EEOC could not have had sufficient notice to investigate that requirement, as it did not arise until December of 2016, and Ms. Margarito never amended her CHRO Complaint to include it.

Thus, Ms. Margarito's termination does not "fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination," and does not qualify as an "incident[] of discrimination carried out in precisely the same manner alleged in" her CHRO Complaint. *Alfano*, 294 F.3d at 381. Her claims based on termination of her employment therefore are not reasonably related to the claims she raised in her CHRO Complaint.

Accordingly, Ms. Margarito has not exhausted her administrative remedies with respect to her claim that her January 4, 2017 termination constituted discrimination against her in violation of Title VII. *See Ceslik v. Miller Ford, Inc.*, 584 F. Supp. 2d 433, 441 (D. Conn. 2008) ("The EEOC would not have had notice of," and therefore plaintiff "did not exhaust his administrative remedies with respect to . . . . claims concerning a hostile work environment based on any pro-terrorism statements . . . ; [defendant's] failure to post notices concerning the ADA and its failure to accommodate his neck and back injuries by requiring him to shovel snow; gender discrimination; and [an] alleged affair.").

Nor has Ms. Margarito exhausted her claims that Defendant violated Title VII because her coworkers spread rumors that she practices witchcraft though she is Christian. Compl. at 3. Although a subsequent claim may in some circumstances be "reasonably related" even where it claims a distinct basis for discrimination from the administrative complaint, such as alleging discrimination on the basis of "race" rather than discrimination on the basis of "national origin," such a claim must still "arise[] out of the same incidents as those alleged" in the administrative complaint. *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 323 (D. Conn. 2004) ("The content of Grey's Title VII allegations in the complaint, however, seems to treat discrimination against her because of her national origin as identical to discrimination against her because of her race. Fact-wise, this would make the claims related."); *see also Forbes v. State*

*Univ. of N.Y. at Stony Brook*, 259 F. Supp. 2d 227, 233–34 (E.D.N.Y. 2003) (plaintiff's ethnicity claim was reasonably related to her EEOC allegations of race, color, and sex discrimination because they were "essentially the same claim").

Ms. Margarito's CHRO Complaint did not allege any rumors that Ms. Margarito practiced witchcraft, did not reference Ms. Margarito's religion, and did not allege discrimination based on religion. Ms. Margarito's claims in her Complaint based on these allegations are therefore not reasonably related to Ms. Margarito's CHRO Complaint. *See Bazile v. City of New York*, 64 F. App'x 805, 807 (2d Cir. 2003) (summary order) ("Bazile's hostile work environment claim fails on both procedural and substantive grounds. First, it is procedurally barred because Bazile did not assert it in a timely EEOC complaint, and it is not 'reasonably related' to the complaint that he did file. As the district court concluded, the EEOC complaint would not have led to an investigation of this claim." (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam))); *Ghose v. Century 21, Inc.*, 12 F. App'x 52, 54 (2d Cir. 2001) ("Ghose's initial complaint with the EEOC described the circumstances of his dismissal, but omitted any allegation that he (a) was penalized for associating with African Americans; (b) faced a hostile work environment; or (c) suffered retaliation for complaints he made to supervisors. These latter allegations are not 'reasonably related' to his allegation of discriminatory termination and are therefore precluded.").

Accordingly, Ms. Margarito has failed to exhaust her administrative remedies as to her claim that she faced discrimination on the basis of her religion, or any claim based on allegations that rumors were circulating that she practiced witchcraft.

Finally, Ms. Margarito alleges that coworkers "accus[ed her] of stealing [and] inappropriate behavior," and that coworkers spread false rumors that she was a lesbian. Compl.

at 2–3. Ms. Margarito's CHRO Complaint also set forth allegations that coworkers were circulating rumors about her behavior, including that she was stealing, and Ms. Margarito alleged that such conduct amounted to discrimination on the basis of her race and perceived sexual orientation.

Thus, to the extent that Ms. Margarito now claims that Defendant discriminated against her on the basis of her race and perceived sexual orientation in violation of Title VII, based on coworkers' alleged rumors regarding her behavior and her sexual orientation, she has exhausted her administrative remedies, and the Court will analyze these claims on the merits.

## B.  The Title VII Claim

Ms. Margarito appears to allege that she was subjected to a hostile work environment based on her race and sexual orientation in violation of Title VII, given that she describes ongoing rumors and accusations that "continued for [two] years" while she worked at Bridgeport Hospital. Compl. at 2–3.

In order to prevail on a hostile work environment claim, a plaintiff must show harassment severe or pervasive enough "to alter the conditions of the victim's employment and create an abusive working environment, and . . . that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373 (internal quotation marks and citations omitted). The plaintiff must demonstrate that the workplace atmosphere was "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

"Courts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). These circumstances include factors such as the frequency of the discriminatory conduct; the severity of the discriminatory conduct; whether the conduct is physically threatening or humiliating (as opposed to merely offensive); and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. These factors are to be evaluated holistically, and no single one is required. *Id.*

Generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.5 (2d Cir. 1995) (citations omitted). While single acts may sometimes be sufficiently severe to form the basis of a hostile work environment claim,[5] alleged incidents giving rise to a hostile work environment claim typically "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577–78 (2d Cir. 1989); *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (affirming district court's grant of summary judgment when plaintiff alleged that her supervisor told her that she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand"), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

---

[5] *See, e.g.*, *Redd v. N.Y.C. Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012) (permitting plaintiff's claim of a hostile work environment to survive summary judgment when a coworker had touched her breasts "without any apparent legitimate need" after "contriv[ing] to be in close proximity" to her); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding a "single incident of verbal harassment" was sufficient, considering all circumstances, because supervisor's verbal harassment was obscene, loud, and occurred in "a large group in which Howley was the only female and many of the men were her subordinates"); *Tomka*, 66 F.3d at 1305 ("Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."); *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 WL 1048751, at *4 (D. Conn. Mar. 11, 2016) ("Physical abuse, such as unconsented touching and striking—particularly on sensitive areas of the body such as buttocks or breasts—are more severe than other forms, such as vulgar banter. . . . In this sense, Thortenson's alleged 'striking' of Flowers'[s] buttocks was particularly severe").

Moreover, Title VII "requires an objectively hostile or abusive environment—one that a reasonable person would find hostile or abusive, not just the alleged victim's subjective perception of the environment. *Harris*, 510 U.S. at 17.

Defendant argues that Ms. Margarito has failed to create a genuine issue of material fact as to her hostile work environment claim because (1) the evidence shows that Bridgeport Hospital was not negligent as to the alleged harassment; and (2) there is no evidence suggesting that the alleged harassment was connected to a protected class under Title VII. Def.'s Mem. at 26–32.

The Court agrees.

Ms. Margarito has failed to create a genuine issue of material fact as to her hostile work environment claim for multiple reasons.

First, she has failed to show that Bridgeport Hospital acted negligently with respect to the alleged harassment.

Where, as here, a plaintiff alleges that the hostile work environment is created by coworkers rather than supervisors, the plaintiff must show that the employer "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). "In determining the appropriateness of an employer's response, we look to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior.'" *Ameti, ex rel. United States v. Sikorsky Aircraft Corp.*, 289 F. Supp. 3d 350, 369 (D. Conn. 2018) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

28

Here, every time Ms. Margarito made a complaint to the Bridgeport Hospital regarding alleged rumors and complaints, the Bridgeport Hospital investigated it immediately. *See* O'Neil Aff. ¶ 5; Malasics March 2016 Complaint Investigation Summary; Employee Responses to Pl.'s Aug. 2016 Allegations. The investigations involved extensive interviews with coworkers and attempts to identify factual bases for Ms. Margarito's claims. Additionally, Ms. O'Neil attempted to mediate a resolution between Ms. Margarito and one of the primary coworkers she alleged was spreading rumors. O'Neil July 2015 Meeting Summary. Finally, in late 2016, Ms. O'Neil discussed with Mr. McCoo Ms. Margarito's ongoing issues, and they met with Ms. Margarito and the coordinator of the Employer and Family Resource Program. O'Neil Aff. ¶ 9. They decided to require that Ms. Margarito consult with the Employer and Family Resource Program.

As a result, there is not a genuine issue of material fact as to whether the Bridgeport Hospital acted in good faith in addressing Ms. Margarito's complaints or record evidence suggesting that the Bridgeport Hospital acted negligently with respect to any harassment Ms. Margarito allegedly faced. *Russell v. New York Univ.*, 739 F. App'x 28, 30 (2d Cir. 2018) ("An employer cannot be subject to a hostile work environment claim, however, if the employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat [the] offensive conduct." (internal quotation marks and citations omitted)). Indeed, there is no evidence in the record suggesting that Bridgeport Hospital failed to respond or responded inappropriately to Ms. Margarito's complaints.

Ms. Margarito also has failed to show by admissible evidence that any alleged pattern of alleged harassing treatment was because of her race or sexual orientation.

Ms. Margarito alleges that she believed colleagues were spreading rumors that she was a lesbian, *see, e.g.*, Margarito Dep. 93:19–94:8; and she stated in her CHRO Complaint that she

29

believed that she was "the only individual of Puerto Rican ancestry and Hispanic heritage working in the ICA" and that she believed another business associate who was "Caucasian" was "not treated in this way," CHRO Compl., ECF No. 34-2 at 106–07.

But there is no evidence in the record suggesting that she was treated differently from individuals of another race. And Ms. Margarito's deposition testimony makes clear that no admissible evidence underlies her beliefs that the conduct she allegedly experienced was based on her race or sexual orientation. Instead, Ms. Margarito repeatedly testified that she had not heard anyone say anything implicating her race or sexual orientation. *See, e.g.*, Margarito Dep. 94:24–95:2 ("Q: What did [Ms. Yacovacci] say that you specifically heard that implicates sexual orientation? A: Specifically I didn't hear her say anything specifically.").[6]

As to evidence in the record regarding Ms. Margarito's sexual orientation, Ms. Margarito refers to a coworker's alleged accusation that Ms. Margarito was "looking at female employees' backsides," Margarito Dep 87:11–88:13; and a student nurse's alleged accusation that Ms. Margarito had groped her, Margarito Dep. 111:4–112:8; Margarito Summary of Events. But it is not clear that these alleged accusations were connected to her sexual orientation, as opposed to merely being comments on the appropriateness of Ms. Margarito's behavior in the workplace.

---

[6] *See also* Margarito Dep. 61:21–62:17:

> Q. Okay. So how do you know it had anything to do with your race, religion or sexual orientation as far as Keri was concerned?
> A. I was the only Hispanic person in the department.
> Q. Anything else?
> A. Pretty much.
> Q. Pretty much what?
> A. Just because I was the only Hispanic person in the department at that time.
> Q. So you made a presumption that she's bullying you and making accusations because you were the only Hispanic?
> A. Correct.
> Q. Okay. Did she ever make remarks about your ethnicity or race?
> A. That I could hear, no.

30

*See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex." (emphasis in original)).

Indeed, the evidence in the record suggests that coworkers and supervisors were concerned about Ms. Margarito's conduct in the workplace generally. *See, e.g.*, Employee Disciplinary Notice Summary (detailing Ms. Margarito's ongoing performance issues affecting patient care); Aquila Resp. to Margarito Rebuttal (stating that there was a "concerning pattern of [Ms. Margarito's] behavior, which d[id] not support the culture of teamwork and safety in the unit," and that the specific instances described "demonstrate[d her] failure to use" "teamwork, problem solver[,] and communication" skills, "which are critical to the safe operation of the ICA."); O'Neil Aff. ¶ 9 (stating that Ms. O'Neil and Mr. McCoo "shared serious concerns for Ms. Margarito's wellbeing, as well as that of her coworkers, some of whom had begun to express a fear for their safety and a belief that Ms. Margarito was creating a hostile work environment.").

As to evidence in the record regarding Ms. Margarito's race, there is a single allegation about Ms. Branca spreading rumors that Ms. Margarito "is discriminatory against African Americans." Margarito Dep. 71:23–72:18. But "[i]solated, minor acts or occasional episodes do not warrant relief[.]" *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) (internal quotation marks omitted)); *see also Grey*, 304 F. Supp. 2d at 327 ("a mild, isolated incident does not make a work environment hostile").

Finally, although Ms. Margarito's discrimination claim is based entirely on her allegations that coworkers were circulating rumors about her, there is no evidence in the record

31

that any rumors about her were circulated. Ms. Margarito's testimony about any rumors alone is insufficient to create a genuine issue of material fact. *See Reilly v. City of W. Haven*, No. 3:02-cv-1346 (SRU), 2005 WL 1293969, at *4 (D. Conn. Mar. 31, 2005) ("[The plaintiff] points only to his own affidavit, his own deposition testimony, and a letter he wrote to a member of the City Council to buttress his claim that the Mayor's actions were retaliatory. The problem is that these documents only contain statements concerning [the plaintiff's] beliefs . . . that [the Mayor] acted to prevent him from obtaining a job. . . ."); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (citing Fed. R. Evid. 602 in stating that where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge (internal quotation marks omitted)); *Rivera v. Brennan*, No. 3:16-cv-330 (VAB), 2018 WL 658832, at *11 (D. Conn. Jan. 31, 2018) ("Ms. Rivera has offered nothing more than speculative testimony that, no matter its ultimate form, would be inadmissible in court." (citing *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." (internal citation omitted)))).

Indeed, the evidence in this record—Ms. Margarito's deposition testimony, along with numerous investigations conducted by Bridgeport Hospital into Ms. Margarito's allegations, all of which resulted in findings that her allegations were unfounded, and Ms. O'Neil's sworn statement that staff concerns were escalating  regarding Ms. Margarito's unfounded accusations towards coworkers— suggests that no such rumors ever existed.

As a result, Ms. Margarito has not raised a genuine issue of material fact that she suffered a hostile work environment based on her race or sexual orientation in violation of Title VII.

Accordingly, summary judgment will be granted to Bridgeport Hospital on Ms. Margarito's Title VII claim.

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of August, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE